UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
JAMES HAWKINS-EL,                               :
                                                :
                          Plaintiff,            :           **OPINION & ORDER**
                                                :           18-cv-07167 (DLI) (LB)
             -against-                          :
                                                :
NEW YORK CITY TRANSIT AUTHORITY,                :
                                                :
                          Defendant.            :
                                                :
-------------------------------------------------------- x

**DORA L. IRIZARRY, U.S. District Judge:**

After filing a discrimination complaint with and subsequently receiving a "Right to Sue" letter from the United States Equal Employment Opportunity Commission ("EEOC"), Plaintiff James Hawkins-El ("Hawkins-El" or "Plaintiff") timely commenced the instant action against his employer, New York City Transit Authority ("NYCTA" or "Defendant"). *See*, Compl., Docket ("Dkt.") Entry No. 1, at ¶¶ 1-2, 7-8. Plaintiff alleges that Defendant created a hostile work environment based on his hearing disability and failed to provide reasonable accommodations, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq. Id.* at ¶¶ 57-72.

Pursuant to the Federal Rule of Civil Procedure 56, Defendant moved for summary judgment dismissing the complaint in its entirety. *See*, Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem."), Dkt. Entry No. 18-2. Plaintiff opposed. *See*, Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Dkt. Entry No. 19-3. Defendant replied. *See*, Def.'s Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Def.'s Reply"), Dkt. Entry No. 20. For the reasons set forth below, Defendant's motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed unless otherwise stated.  The Court declines to accept Plaintiff's Response to Defendant's Rule 56.1 Statement, Dkt. Entry No. 19-1, and Plaintiff's Local Rule 56.1(b) Counterstatement of Material Facts, Dkt. Entry No. 19-2.  Plaintiff's Rule 56.1 Statements and Counterstatements contain numerous mischaracterizations of the record and mere regurgitations of Plaintiff's claims that are not supported by the record and, thus, cannot be considered as material facts.  *See*, Local Civil Rules 56.1(b)-(c).  The Court's local rules provide that, where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertions.  *See*, Local Civil Rule 56.1(d).  As such, the Court will not adopt nor cite to any portion of Plaintiff's Rule 56.1 Statements or Counterstatements.

"The purpose of these rules is to enhance the Court's efficiency in reviewing motions for summary judgment by freeing the Court from hunting through a voluminous record without guidance from the parties."  *Watt v. New York Botanical Garden*, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000).  In deciding the instant motion, the Court did not rely on the parties' Rule 56.1 statements and has made a thorough examination of the extensive record in this case in search of evidence in support of Plaintiff's opposition.  *See*, *Sawyer v. Wight*, 196 F. Supp.2d 220, 225 (E.D.N.Y. 2002) ("While District Courts are not required to consider what the parties fail to point out in their . . . 56.1 statements, they may discretionarily choose to search the record of their own accord.") (internal quotation marks and citations omitted).  All factual disputes are resolved, and all reasonable inferences are drawn, against Defendant.  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007).

Plaintiff has been working at NYCTA's Linden Yard location since February of 1992, starting out as a lubricator helper.  *See*, Dep. of Hawkins-El ("Hawkins-El Dep."), Ex. A to Aff.

of Stephen Fitzgerald ("Fitzgerald Aff."), Dkt. Entry No. 19, at 7.  Around 1993, Plaintiff became a Special Operator, the official title of which is "Track Worker (Specialist)."  *Id*. at 8-9; *See also*, Job Detail Summary of Hawkins-El ("Job Detail Summary"), Ex. H to Daniel Chiu's Decl. in Supp. of Def.'s Mot. for Summ. J. ("Chiu Decl."), Dkt. Entry No. 18-3, at 3.  Between 1993 and 2017, Plaintiff held variations of the Special Operator position, operating tractor trailers, pay loaders, forklifts, cranes, dump trucks, and other heavy machinery.  Hawkins-El Dep. at 9-11.

Plaintiff suffers from hearing loss.  *Id*. at 24-25; *See also*, Letter from Alvin Katz, dated August 25, 2009 ("Katz Letter"), Ex. H to Fitzgerald Aff., Dkt. Entry No. 19, at 1-2.  NYCTA was aware of the hearing impairment and required Plaintiff to be examined periodically by Dr. Alvin Katz, an otorhinolaryngologist.  *See*, Katz Letter at 1-3.  Between 2005 and 2009, Plaintiff visited Dr. Katz four times.  *Id*. at 1.  During the visits, Plaintiff explained that his hearing loss could have been caused by exposure to excessive noise from heavy equipment and diesel engine at his work.  *Id*. at 1-2.  However, Dr. Katz determined that Plaintiff's hearing loss was not attributed to his employment.  *Id*. at 3.

According to Dr. Katz, Plaintiff "has a non-noise exposure, non-employment, pre-existing and progressive conductive hearing loss probably from an osteosclerotic etiology . . . . Typically, a conductive hearing loss with good nerve function as [Plaintiff] has, is related to osteosclerotic type fixation and not from deleterious noise exposure in the work environment." *Id*.  Dr. Katz determined that Plaintiff "has a large conductive hearing loss in the low, mid and speech frequencies . . . .  There has been progression in his hearing loss despite the use of ear protection and by internal protection from a large conductive component."  *Id*. at 4.

Dr. Katz further opined that "[a]ny additional hearing loss is from non-noise exposure

and non-employment causes . . . ."  *Id.*  Nonetheless, Dr. Katz stated that Plaintiff "should be able to function in a work and social environment" and "would benefit from a hearing-assistive device for his non-noise exposure and non-employment exposure . . . ."  *Id.*  Dr. Katz advised that Plaintiff should continue to utilize ear protection whenever he is exposed to loud or deleterious noise.  *Id.*

The noise level at Linden Yard was determined by the type of equipment being utilized, but noise tended to dissipate into the air due to its outdoor location.  *See*, Dep. of Christ Alberto ("Alberto Dep."), Ex. C to Fitzgerald Aff., Dkt. Entry No. 19, at 36.  Despite his hearing loss, with the help of hearing aids and NYCTA-issued ear protection, Plaintiff continued to perform his Special Operator duties at Linden Yard without any incident until February of 2017.  *See*, Dep. of Joseph Micelotta ("Micelotta Dep."), Ex. D to Fitzgerald Aff., Dkt. Entry No. 19, at 12, 31.  On February 8, 2017, while standing near a crane at Linden Yard, Plaintiff saw a colleague waiving his arms frantically towards Plaintiff.  *See*, Mem. by Hawkins-El, dated February 8, 2017, Ex. K to Fitzgerald Aff., Dkt. Entry No. 19, at 1.  When Plaintiff turned around, he saw a forklift, operated by Robert Sadowski ("Sadowski"), stopping "less than a foot away" from him. *Id.*

When Joseph Micelotta ("Micelotta"), Plaintiff's superintendent at Linden Yard, learned about the forklift incident, he figured that Plaintiff's hearing impairment caused Plaintiff not to hear the forklift.  *See*, Micelotta Dep., Ex. C to Chiu Decl., Dkt. Entry No. 18-3, at 7, 32-33.  Micelotta directed Plaintiff to the NYCTA Medical Assessment Center ("MAC") for an examination.  *Id*. at 32.  On March 7, 2017, Dr. Hae Chung, a physician at the MAC, examined Plaintiff and determined that he was qualified for "Restricted Work Temporary" due to his hearing impairment.  *See*, Request for Services, dated March 7, 2017, Ex. J to Chiu Decl., Dkt.

4

Entry No. 18-4.  Dr. Chung noted that Plaintiff "must wear hearing protection" and required another visit.  *Id*.

On March 17, 2017, Plaintiff called Micelotta to ask whether Sadowski was working at Linden Yard.  *See*, Mem. by Hawkins-El, dated March 21, 2017 ("March 21, 2017 Mem."), Ex. P to Fitzgerald Aff., Dkt. Entry No. 19, at 1.  According to Plaintiff, Micelotta immediately became agitated and screamed at Plaintiff, "I don't have to fucking call you," "why should I fucking call you," and "you just keep dragging your feet with this hearing thing, go down Monday and get tested."  *Id*.  Once Micelotta calmed down, Plaintiff told Micelotta that he needed to know if Sadowski is at Linden Yard so he could avoid another "unwanted forced encounter" with Sadowski.  *Id*. at 2.

On April 3, 2017, Dr. Chung requested a "hearing practical test" for Plaintiff.  *See*, Request for ADA Practical Field Testing, dated April 3, 2017, Ex. K to Chiu Decl., Dkt. Entry No. 18-4.  As part of the request, Dr. Chung noted that Plaintiff had been diagnosed with "bilateral moderate to severe hearing loss" and that he has "hearing aids."  *Id*.  As a result, on April 19, 2017, Gloria Bolt ("Bolt"), an associate staff analyst at the NYCTA Division of Occupational Health Services ("OHS"), initially scheduled Plaintiff's practical field test for May 5, 2017 at the 45th Street Station in Brooklyn.  *See*, Email from Bolt, dated April 19, 2017, Ex. L to Chiu Decl., Dkt. Entry No. 18-4.

On April 24, 2017, Plaintiff sent a document titled "NOTICE!" to Micelotta.  *See*, Notice by Hawkins-El ("Notice"), dated April 24, 2017, Ex. M to Chiu Decl., Dkt. Entry No. 18-4, at 1; Email by Hawkins-El, dated May 18, 2017 ("May 18, 2017 Email"), Ex. O to Chiu Decl., Dkt. Entry No. 18-4, at 1.  In the Notice, Plaintiff stated, "I absolutely must refuse any test to be done on my unprotected ears in the underground subway system under normal conditions, with regular

train traffic, as the risk of further damage to my ears is too great."  Notice at 1.  Plaintiff noted

that there are extremely loud and excessive noises in subway tunnels, and he wears hearing aids

due to "a work related injury" from "exposure to just this type of excessively loud noise."  *Id.*

Plaintiff also objected to the test location because it "does not mirror at all [his] regular work

environment."  *Id.*

The practical field test was rescheduled from May 5, 2017 to May 25, 2017, but the test

location remained the same.  *See*, Email by Judith Buckley, dated May 10, 2017, Ex. T to

Fitzgerald Aff., Dkt. Entry No. 19, at 2; May 18, 2017 Email at 1.  Plaintiff sent an email to Bolt,

stating that he will "fully comply with the legal mandate of the 'Practical Field Test' scheduled

'Friday May 25, 2017.'"  May 18, 2017 Email at 1.  Plaintiff requested that Micelotta drive him

to the test site so he could "avoid the noise hazards directly associated to/with the underground

subway system."  *Id*.  During the test, Plaintiff wore his hearing aids and hearing protection.

Hawkins-El Dep., Ex. B to Chiu Decl., Dkt. Entry No. 18-3, at 37; *See also*, Practical Field Test

Summary Report, dated September 6, 2017 ("PFT Sum. Rept."), Ex. U to Fitzgerald Aff., Dkt.

Entry No. 19, at 2.

The purpose of the test was "to determine if [Plaintiff] could function well in the actual

job environment while wearing aids."  PFT Sum. Rept. at 2.  The practical field test required

Plaintiff to hear:  (1) a train horn from a distance of 700 feet; (2) a flagman's whistle from a

distance of 300 feet; (3) verbal instructions from a supervisor in a normal voice tone for the

environment; and (4) and identify the direction of approaching trains.  *Id.* at 3.  Plaintiff was able

to hear the train horn, flagman's whistle, and instructions from a supervisor.  *Id.*

However, Plaintiff failed the test because he "did not adequately respond to hearing an

approaching train" and he "did not demonstrate his ability to hear or identify the direction of

approaching trains." *Id*.  A total of twelve observers from various NYCTA departments were present during the test.  *Id*. at 2-4.  An observer from the Operations Training Department noted that Plaintiff should not "work around moving trains and equipment."  *Id*. at 4.  The report further noted that Plaintiff "did not demonstrate that he was capable of hearing and identifying the direction of approaching trains and is therefore unable to function well in the actual job environment of a Track Worker."  *Id*.

On May 26, 2017, Dr. Chung learned that Plaintiff had failed the test.  Dep. of Hae Chung ("Chung Dep."), Ex. D to Chiu Decl., Dkt. Entry No. 18-3, at 37.  As a result of the failed test, Dr. Chung placed permanent medical restrictions on Plaintiff, starting on May 30, 2017.  *See*, PMD Information Request, dated December 27, 2017, Ex. Q to Chiu Decl., Dkt. Entry No. 18-4.  The restrictions included avoiding excessive noise levels and being off tracks.  *Id.*  Due to these restrictions, Plaintiff had no available work.  *See*, On the Job Injury Management Follow-up Form, dated June 1, 2017, Ex. S to Chiu Decl., Dkt. Entry No. 18-4.

On June 13, 2017, Plaintiff was no longer restricted from working on tracks, but still was restricted from working at locations with excessive noise levels.  *See*, Employee Restrictions, dated June 16, 2017, Ex. Z to Fitzgerald Aff., Dkt. Entry No. 19, at 3.  Micelotta emailed Bolt and asked her what he should do with Plaintiff, given the change in Plaintiff's restrictions.  Email by Micelotta, dated June 22, 2017, Ex. Z to Fitzgerald Aff., Dkt. Entry No. 19, at 2.  In response to the email, Dr. Suzanne Lim, the Medical Director of Occupational Health Services ("OHS") at the Metropolitan Transportation Authority ("MTA"), stated that "[e]mployee medical restrictions are determined by a physician in the MAC and not by the staff involved with the field testing. [Plaintiff's] only restriction at this time is that he should not perform duties [sic] which would expose him to excessive noise. . . .  He would be able to perform any other assignments."  Email

by Suzanne Lim, dated June 22, 2017 ("June 22, 2017 Email"), Ex. Z to Fitzgerald Aff., Dkt.
Entry No. 19, at 1.  On June 22, 2017, another restriction to Plaintiff's work status was added,
preventing him from operating any transit vehicle.  *See*, Clinic Visit Note, dated February 15,
2018, Ex. LL to Daniel Chiu's Reply Decl. in Further Supp. of Def.'s Mot. for Summ. J. ("Chiu
Reply Decl."), Dkt Entry No. 20-1.

On July 28, 2017, Micelotta completed an internal NYCTA memorandum, noting that
Plaintiff was on "no work status" due to a failed audiogram and requesting that Plaintiff receives
"another audiogram to determine if he can return to work in full capacity."  Mem. by Micelotta,
dated July 28, 2017 ("July 28, 2017 Mem."), Ex M to Fitzgerald Aff., Dkt. Entry No. 19, at 3.
On July 28, 2017, Dr. Chung referred Plaintiff to an independent hearing examination.  *See*,
Request for Services, dated July 28, 2017, Ex. BB to Fitzgerald Aff., Dkt. Entry No. 19.  On July
11, 2017, Plaintiff was seen by Dr. Michael Alleva, an otolaryngologist.  *See*, Letter from
Michael Alleva, dated July 13, 2017, Ex. AA to Fitzgerald Aff., Dkt. Entry No. 19.  After
conducting an audiogram and comparing it to Plaintiff's previous one from September 24, 2016,
Dr. Alleva determined that, "within a reasonable degree of medical certainty, one could
conclude, that [Plaintiff's] hearing loss has gotten worse secondary to the incident of loud noise
exposure" from the May 25, 2017 practical field test.  *Id*.

On August 30, 2017, after examining Plaintiff's hearing, Dr. Katz selected "Full Work"
as Plaintiff's work status, but noted that he "must use ear protection if exposed to noise."
Workers' Compensation IME Form ("IME Form"), dated August 30, 2017, Ex. MM to Chiu
Reply Decl., Dkt. Entry No. 20-1.  Dr. Katz additionally determined that, based on Plaintiff's
"36.3" percent hearing impairment, Plaintiff has a permanent, moderate degree of disability, if he
does not use his hearing aids.  *Id*.  Dr. Katz also noted that Plaintiff's work status was "Full

Work" with ear protection. *Id.* Micelotta signed the IME Form and noted that there was work available for Plaintiff and that Plaintiff could return to work on August 31, 2017. *Id.*

On August 31, 2017, with an agreement reached between Plaintiff's union and Micelotta, Plaintiff returned to work, but not to operating heavy machinery. *See*, Dep. of John Brown ("Brown Dep."), Ex. E to Chiu Decl., Dkt. Entry No. 18-3, at 56; Alberto Dep. at 78-79. Instead, he was "relegated to the lower portion of the yard away from the tracks," controlling the load as it was loaded and unloaded from the trucks. *Id.* at 79, 103. On October 20, 2017, Micelotta complete an internal NYCTA memorandum, which noted that "the department is recommending another audiogram for the purpose of re-evaluating [Plaintiff's] current status and to determine if he has any restrictions which would limit him from performing his specialist operator duties." Mem. by Micelotta, dated October 20, 2017 ("October 20, 2017 Mem."), Ex. M to Fitzgerald Aff., Dkt. Entry No. 19, at 2.

Nonetheless, between September 1, 2017 and February 15, 2018, Plaintiff continued to receive the Special Operator's pay rate. *See*, Paystubs of James El-Hawkins from May 28, 2017 to February 17, 2018, Ex. T to Fitzgerald Aff., Dkt. Entry No. 19. During his visit to the MAC on December 27, 2017, Plaintiff stated he did not want to take another practical hearing test. *See*, Clinic Visit Note, dated February 15, 2018, Ex. LL to Chiu Reply Decl., Dkt. Entry No. 20-1. In response, Dr. Lim stated that, if Plaintiff "is unwilling to do another practical field test to show he can perform the job safely, then his work status stays the same." *Id.*

On January 19, 2018, Superintendent Joseph Nasella ("Nasella") told Plaintiff that he is "currently being held restricted until [he] provide[s] the results of the audio metric assisted hearing test the MAC center told [him] to get." Email by Nasella, dated January 19, 2018, Ex. W to Chiu Decl., Dkt. Entry No. 18-5, at 1. Nasella added that Plaintiff must provide the test

result by February 27, 2018 and then his "situation will be re-evaluated." *Id*. On February 1, 2018, Dr. Lim received an email, asking whether Plaintiff had visited the MAC after June 6, 2017 and to clarify Plaintiff's current restriction and what constitutes "Avoid Excessive Noise." *See*, Email by Jacob Snull, dated February 1, 2018, Ex. V to Fitzgerald Aff., Dkt. Entry No. 19, at 2. Dr. Lim replied that Plaintiff had visited the MAC four separate times since June 6, 2017 and that "[h]is restrictions have not been changed." Email from Lim, dated February 1, 2018, Ex. V to Fitzgerald Aff., Dkt. Entry No. 19, sat 1. Dr. Lim further noted that she had not received Plaintiff's Workers' Compensation claim or his IME form. *Id*.

On February 11, 2018, Plaintiff underwent an audiogram, in which he achieved 100 percent of hearing discrimination scores on both of his ears with his hearing aids in place. *See*, Audiogram Results, dated February 11, 2018, Ex. DD to Fitzgerald Aff., Dkt. Entry No. 19. The audiogram also showed that Plaintiff suffered hearing impairment without hearing aids. *Id*. On February 15, 2018, Dr. Chung noted that Plaintiff presented the February 11, 2018 audiogram results to the MAC. *See*, Clinic Visit Note, dated February 15, 2018, Ex. LL to Chiu Reply Decl., Dkt. Entry No. 20-1. Nevertheless, restrictions on Plaintiff's work status remained, and he was put out of work from February 15, 2018 to July 2, 2018. *See*, Alberto Dep. at 82-85; Hawkins-El Dep. at 49.

On February 28, 2018, Plaintiff discussed with John Brown ("Brown"), the General Superintendent, and Alberto "a possible opportunity to fill a restricted duty job in the Linden Fabrication Facility." Email by Alberto, dated February 28, 2018, Ex. Y to Chiu Decl., Dkt. Entry No. 18-5, at 1. The position was titled "Restricted Duty Trackworker – 24TK034" with "Gang TA2405," and its duties included cleaning and maintaining facilities at the Linden Fabrication shop. *See*, RC 2824 Job Description, Ex. Y to Chiu Decl., Dkt. Entry No. 18-5, at 3.

The job description stated that employees "[w]ill be subject to daily overhead crane movement of material, Transit operated forklifts and payloaders, Tractor Trailer deliveries of required material and inventory, Tie drilling machines, Band Saws, reciprocating saws and various track assembly equipment." *Id*.

After his meeting with Brown and Alberto, Plaintiff filed a written request to fill the vacant restricted duty position. *See*, Mem. by Hawkins-El, dated February 28, 2018 ("February 28, 2018 Mem."), Ex. Y to Chiu Decl., Dkt. Entry No. 18-5, at 2. Additionally, on March 1, 2018, Plaintiff emailed Judith Buckley ("Buckley"), the Deputy Chief ADA Compliance Officer for the MTA, requesting to fill the position. *See*, Email by Hawkins-El, dated March 1, 2018 ("March 1, 2018 Email"), Ex. Z to Chiu Decl., Dkt. Entry No. 18-5, at 4. On March 5, 2018, Buckley informed Plaintiff that, before he can fill the position, the management must check the decibel level at the Linden Yard facility and that Plaintiff may need to take another practical field test. *See*, Email by Buckley, dated March 5, 2018, Ex. Z to Chiu Decl., Dkt. Entry No. 18-5, at 3.

On March 22, 2018, Plaintiff, Plaintiff's attorney at the time, Buckley, and representatives from the Department of Labor Relations had an interactive process meeting to discuss the vacant restricted duty position at the Linden Fabrication shop and Plaintiff's request for accommodation. *See*, Email by Buckley, dated March 15, 2018 ("March 15, 2018 Email"), Ex. Z to Chiu Decl., Dkt. Entry No. 18-5, at 2; *See also*, Email by Hawkins-El, dated March 23, 2018, Ex. AA to Chiu Decl., Dkt. Entry No. 18-5, at 5. Plaintiff was informed that he must undergo a new practical field test before he could fill the vacant position. *See*, Email by Stephen Perez, dated April 1, 2018, Ex. AA to Chiu Decl., Dkt. Entry No. 18-5, at 1. On April 25, 2018, prior to taking the new practical field test, Plaintiff received a termination notice. *See*, Extended

Absence (60 Days or More) Notification, dated April 25, 2018 ("April 25, 2018 Termination Notice"), Ex. GG to Fitzgerald Aff., Dkt. Entry No. 19.  The notice informed Plaintiff that, due to his absence or inability to perform the duties of his position due to his "non-service connected illness/injury since" February 16, 2018, NYCTA may seek termination of his employment if his status continued.  *Id.*  However, Jason Scheu ("Scheu"), the Director of Labor Contract Disputes at NYCTA, paused any potential termination action against Plaintiff.  Email by Scheu dated May 3, 2018 ("May 3, 2018 Email"), Ex. OO to Chiu Reply Decl., Dkt. Entry No. 20-1, at 1.

On June 14, 2018, Plaintiff took the practical field test which took place at the Linden Yard shop and was created specifically for the position.  Dep. of Gloria Bolt ("Bolt Dep."), Ex. G to Chiu Decl., Dkt. Entry No. 18-3, at 94, 97-98.  The purpose of the test was to determine if Plaintiff "could function well in the actual job environment with restrictions while using a hearing aid."  Practical Field Test Summary Report, dated July 2018 ("Second PFT Sum. Rept."), Ex. FF to Fitzgerald Aff., Dkt. Entry No. 19, at 3.  Plaintiff, while wearing his hearing aids and hearing protection, passed all components of the test, which required him to hear instructions in the shop while equipment was operating and to identify warning devices in the shop.  *Id*. at 3-4.  The observers determined that Plaintiff "could function well in the actual job environment of a Track Worker with restricted work at the Linden Yard shop."  *Id*. at 4.  As a result, on July 2, 2018, Plaintiff returned to work and was assigned to the restricted duty position with Gang TA2405 that he requested.  *See*, Hawkins-El Dep., at 21-22, 49.

Plaintiff brings two causes of action under the ADA.[1]  First, Plaintiff claims that twelve separate incidents between February 8, 2017 and July 2, 2018 created a hostile work environment for him based on his disability.  *See*, Pl.'s Opp'n. at 2-3, 6-9.  Second, Plaintiff

---

[1] Initially, there was some confusion as to whether Plaintiff also brought a disparate treatment claim under the ADA. *See*, Def.'s Mem. at 4-8; Def.'s Reply at 2 n.1.  However, Plaintiff clarified that the instant action includes hostile work environment and reasonable accommodation claims only.  *See*, Pl.'s Opp'n at 1, 6-7, 11.

claims that Defendant denied him reasonable accommodations by removing him from the Special Operator position and by rejecting his request to not be exposed to excessively loud noise levels during practical field tests. *Id*. at 3, 17-20. Defendant counters that Plaintiff has not alleged any incident that created hostile work environment and has failed to establish the *prima facie* case for his reasonable accommodation claim. *See*, Def.'s Mem. at 9-14.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy*, 482 F.3d at 202 (internal quotations omitted). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]hen opposing parties tell two different stories,

one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted).

The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

## DISCUSSION

## I.   Plaintiff's Hostile Work Environment Claim

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Second Circuit has held that "hostile work environment claims are

cognizable under the ADA." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 69 (2d Cir. 2019). To prevail on a hostile work environment claim, Plaintiff must show:  "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  *Id.* at 74 (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)) (internal quotation marks and citation omitted).

"This test has objective and subjective elements:  the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  *Alfano*, 294 F.3d at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered. A plaintiff alleging a hostile work environment claim under the ADA, therefore, must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  *Fox*, 918 F.3d at 74 (citing *Alfano*, 294 F.3d at 374) (internal quotation marks omitted).  "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'"  *Id.* (quoting *Harris*, 510 U.S. at 23).

Plaintiff alleges that the following twelve incidents created a hostile work environment: (1) Micelotta's "unusual and repetitive" orders to Plaintiff to get hearing tests; (2) abusive yelling and cursing from Micelotta about Plaintiff's hearing; (3) NYCTA's refusal to

accommodate his request not be tested in subway tunnel; (4) NYCTA's medical staff requiring Plaintiff's exposure to unnecessary and loud noises in a practical field test; (5) removing Plaintiff from active service based on a practical field test that was not related to his job; (6) purposefully exposing Plaintiff to conditions that injured his hearing; (7) denying Plaintiff his regular pay for months; (8) preventing Plaintiff from his Specialist Operator duties; (9) refusing to accept the result of Plaintiff's aided hearing test results and then ordering him out of service for a second time without pay; (10) forcing Plaintiff, upon a threat of employment termination, to accept a "bathroom cleaning job" for a lower pay rate; (11) subjecting Plaintiff to a second practical field test; and (12) having Plaintiff work in "the demeaning janitorial position" with no opportunity for overtime.  Pl.'s Opp'n at 2-3.  However, these alleged incidents described by Plaintiff are not found in the record provided to the Court.

A determination as to whether these incidents created a hostile work environment "can be made only by carefully examining the circumstances in their totality, weighing the nature, severity, and frequency of the conduct." *Alfano*, 294 F.3d at 376.  The one alleged incident that stands out for its overtly abusive nature is when Micelotta purportedly yelled and cussed at Plaintiff.  *See*, Pl.'s Opp'n at 2, 8.  Plaintiff alleges that, during a March 17, 2017 phone call, Micelotta screamed at Plaintiff, "I don't have to fucking call you," "why should I fucking call you," and "you just keep dragging your feet with this hearing thing, go down Monday and get tested."  March 21, 2017 Mem. at 1.  Plaintiff did not receive any other derogatory statements about his hearing.  Hawkins-El Dep. at 70.  This isolated act is not severe enough to constitute a hostile work environment.  *See*, *Fox*, 918 F.3d at 74; *Alfano*, 294 F.3d at 374; *See also*, *Crawford v. New York Life Ins. Co.*, 2006 WL 2792779, at *7 n.4 ("Simple teasing, offhand comments, and isolated incidents . . . will not amount to discriminatory changes in the terms and conditions of

employment sufficient to meet the threshold of severity or pervasiveness.") (internal quotation marks and citation omitted).

The only other potentially instance of harassment is when Micelotta repeatedly required Plaintiff to get his hearing examined. *See*, Pl.'s Opp'n at 2, 8; *See also*, Hawkins-El Dep. at 65-69. Plaintiff alleges that, between March 7, 2017 and 2018, Micelotta sent him to the MAC for checkups "over 10 or 11 times." *See*, Hawkins-El Dep. at 66-68. As an initial matter, there is no evidence in the record to support the alleged number and frequency of MAC visits. In addition, even if the allegation were true, requiring Plaintiff to attend medical appoints for his known hearing impairment cannot establish an objectively abusive work environment, particularly where, as here, Plaintiff's safety was a concern. *See*, *Fox*, 918 F.3d at 74 (the record must support a finding that the workplace was both subjectively and objectively offensive). Micelotta knew Plaintiff suffered from hearing loss. *See*, Micelotta Dep. at 31-33. It was reasonable for Micelotta, as Plaintiff's superintendent, to require Plaintiff to get his hearing examined, especially after the February 8, 2017 incident where Plaintiff nearly was injured by a forklift that he apparently did not hear coming and once Plaintiff failed his first practical field test. *Id*. at 31-33, 56-57.

Moreover, there is no evidence that Micelotta acted with any discriminatory motive or animosity when he ordered Plaintiff to go to the MAC. *See*, *Alfano*, 294 F.3d at 377 (in a hostile work environment case, the plaintiff has the burden to establish "a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus"). On at least two occasions, Micelotta wanted Plaintiff to get his hearing examined so Plaintiff could return to work and return at full capacity. On July 28, 2017, Micelotta asked if Plaintiff could get an "audiogram to determine if he can return to work in full capacity." July 28, 2017 Mem. On

17

October 20, 2017, Micelotta noted that "the department is recommending another audiogram for the purpose of re-evaluating [Plaintiff's] current status and to determine if he has any restrictions . . . ." October 20, 2017 Mem.

The remaining ten alleged incidents revolve around Plaintiff's belief that NYCTA employees wronged him by subjecting him to practical field tests and removing him from his Special Operator position. These incidents do not relate to his actual work environment. Instead, the alleged incidents describe Plaintiff's displeasure with a series of personnel and medical decisions made by various employees in several different NYCTA departments. Nonetheless, Plaintiff explicitly stated that he "is *not* asserting an adverse action claim." Pl.'s Opp'n at 7 (emphasis in original).

The analysis into the existence of hostile work environment differs from a disparate treatment analysis. *See*, *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) ("Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is 'abusive.'") (citation omitted). Plaintiff attempts to establish the existence of a hostile work environment merely by listing the alleged incidents and stating that, "[t]ogether, these actions created a pervasively hostile work environment for [Plaintiff] because of his hearing disability." Pl.'s Opp'n at 8-9. Plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Plaintiff cites *Fox* in support of his hostile work environment claim. Pl.'s Opp'n at 7-8. However, the plaintiff in *Fox* underwent a significantly different experience than Plaintiff here. In *Fox*, the Second Circuit held that, since the plaintiff "identified specific comments – his co-

18

workers mocking his Tourette's by repeating 'hut-hut-hike,' presumably while touching the floor – and because he testified that 'whenever I said [the F word], they said "hut-hut-hike"' for 'months and months,' [he] has provided evidence sufficient to meet his burden to demonstrate pervasiveness." *Fox*, 918 F.3d at 74.  Consequently, the Second Circuit found that the plaintiff provided evidence of abuse "sufficiently severe and pervasive to change the conditions of [his] employment." *Id.*

The Second Circuit has discussed what constitutes severity or pervasiveness of conduct sufficient to create an objectively hostile or abusive work environment in other cases as well.  In *Raniola*, the Circuit Court held that a triable issue existed where the plaintiff had demonstrated that, in a span of two and half years, she was subjected to "offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm." *Raniola*, 243 F.3d at 621 (2d Cir. 2001).  In *Schwapp*, the court found that the plaintiff had created a triable issue of fact based on ten to twelve instances of explicitly racist conduct in twenty months, where most of the incidents involved racial jokes and epithets that insulted a number of different ethnicities and national origins. *Schwapp*, 118 F.3d at 112 (2d Cir. 1997).  In *Cruz v. Coach Stores, Inc.*, the court found a triable issue where the plaintiff demonstrated that a supervisor "subjected her and others to blatant racial epithets on a regular if not constant basis," made "repeated remarks" that women should not work, and physically harassed the plaintiff and other women by standing very close when he spoke to them.  202 F.3d 560, 571-72 (2d Cir. 2000).  Plaintiff's alleged incidents here do not meet the requisite level of pervasiveness or abusiveness established in the above cases.

Furthermore, to the extent that Plaintiff relies on "facially neutral incidents to create the quantum of proof necessary to survive" a motion for judgment as a matter of law,  he "must have

established a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus." *Alfano*, 294 F.3d at 377. "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Id.* at 377; *See also*, *Byrnie v. Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("[The court's] role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments.") (internal quotation marks and citation omitted).

Nonetheless, the Second Circuit has emphasized that "trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. General Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996) (citations omitted). "Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination." *Id.* (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

A careful examination of the record in the light most favorable to Plaintiff reveals no evidence, circumstantial or otherwise, that the NYCTA employees acted with any discriminatory motive or animus. Plaintiff provides no evidence of NYCTA employees engaging in any derogatory, offensive, or discriminatory remarks or behavior towards Plaintiff in relation to his disability. The record does not support his claim that MAC physicians, OHS staff and other NYCTA employees purposefully created the practical field tests to expose Plaintiff to loud and

excessive noises to further damage his hearing.  Pl.'s Opp'n at 10.  The first practical field test was a standard one for track workers and Plaintiff wore his hearing aids and ear protection during the test.  *See*, Bolt Dep. at 99; PFT Sum. Rept. at 3.  NYCTA specifically created the second practical field test to permit Plaintiff to qualify for the restricted duty position that he requested to fill.  *See*, Bolt Dep. at 99.

Additionally, the record does not support Plaintiff's claim that his supervisor and superintendents at Linden Yard prevented him from returning to the Special Operator position. In fact, they did not have the authority to change Plaintiff's restrictions.  *See*, June 22, 2017 Email at 1 ("Employee medical restrictions are determined by a physician in the MAC and not by the staff involved with the field testing.").  Moreover, Plaintiff offers no evidence from which it can be inferred that the MAC physicians placed restrictions on Plaintiff with a discriminatory intent.

Significantly, it is rather disingenuous for Plaintiff to contend that he was forced to accept the janitorial position under the threat of termination since he specifically requested to fill the position.  *See*, Pl.'s Opp'n at 9; *See also*, Email by Alberto, dated February 2018, Ex. Y to Chiu Decl., at 1.  Plaintiff submitted two separate written requests to fill the position and had an interactive session about it.  *See*, February 28, 2018 Mem.; March 1, 2018 Email; March 15, 2018 Email.  This all occurred before he received a termination notice on April 25, 2018 due to his continued absence from or inability to perform the duties of his position.  *See*, April 25, 2018 Termination Notice.  In fact, any potential termination action was put on hold by Scheu, the Director of Labor Contract Disputes at NYCTA.  *See*,  May 3, 2018 Email.

In sum, Plaintiff has failed to provide any evidence of harassment that was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working

environment." *Fox*, 918 F.3d at 74. Plaintiff also has failed to demonstrate that Defendant's actions were motivated by discriminatory animus. The Court concludes that no reasonable jury could find that Plaintiff suffered a hostile work environment due to his disability. Accordingly, Defendant is entitled to summary judgment as to Plaintiff's hostile work environment claim.

## II.    Plaintiff's Reasonable Accommodation Claims

Plaintiff alleges that NYCTA violated the ADA by denying the following accommodation requests: "(1) that he keep his job as a Special Operator in the Linden Yard; and (2) that he not be forced to take practical field tests in environments with excessively loud noise that do not replicate the conditions in which he actually worked." Pl.'s Opp'n at 14. The ADA obligates covered employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" includes someone who is disabled but who, with "reasonable accommodation," can perform "the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

"ADA employment discrimination claims are subject to the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): A plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis North Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program*, 198

F.3d 68, 72 (2d Cir. 1999)).

To establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must demonstrate that:  "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *McMillan v. City of N.Y.*, 711 F.3d 120, 125-26 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

The parties do not dispute that Plaintiff has a disability recognized under the ADA and that Defendant had notice of the disability.  *See*, Def.'s Mem. at 4 n.1; Pl.'s Opp'n at 13 n.3. Therefore, the *prima facie* inquiries on Plaintiff's claims "concern[] only whether [Plaintiff] made a sufficient showing that, with reasonable accommodation, [he] could perform the essential functions of the relevant job and that [NYCTA] failed to make the appropriate accommodations." *McBride*, 583 F.3d at 97.

The plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment." *McMillan*, 711 F.3d at 126 (internal quotation marks and citations omitted).  As such, "generally, 'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (quoting 29 C.F.R. pt. 1630, app. at 363 (2003)).  Nevertheless, "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008).

23

It is not clear what accommodation Plaintiff sought when he demanded to return to the Special Operator position.  Defendant knew of Plaintiff's hearing disability and addressed it by removing him from the Special Operator position to limit his exposure to excessive noise.  *See*, PMD Information Request, dated December 27, 2017, Ex. Q to Chiu Decl.; On the Job Injury Management Follow-up Form, dated June 1, 2017, Ex. S to Chiu Decl.; Employee Restrictions, dated June 16, 2017, Ex. Z to Fitzgerald Aff., at 3.  In fact, Plaintiff told to Dr. Katz that, as a Special Operator, he regularly was exposed to excessive noise from heavy machinery and its diesel engines.  *See*, Katz Letter, Ex. H to Fitzgerald Aff., at 1-2.

There is no evidence that Plaintiff sought the Special Operator position as an accommodation to his hearing loss.  Even in his memorandum in opposition to the instant motion, Plaintiff does not identify any evidence in the record that he asked for such an accommodation.  Instead, Plaintiff argues that Defendant refused to provide Plaintiff with a reasonable accommodation by "forc[ing] him to submit to a position cleaning bathroom" under the threat of termination.  *See*, Pl.'s Opp'n at 17, 19, 22.  As previously noted, this argument is meritless because Plaintiff was not facing any termination action when he requested to fill the restricted duty janitorial position.

After he had requested to fill the vacant janitorial position and had gone through an interactive process meeting about it, Plaintiff demanded that his medical restrictions be changed so he could be reinstated to the Special Operator position.  *See*, Emails by Hawkins-El, dated March 23, 2018; March 30, 2018; March 31, 2018; April 1, 2018, Ex. AA to Chiu Decl., Dkt. Entry No. 18-5, at 1-4.  However, Plaintiff has failed to demonstrate how returning to the Special Operator position would have accommodated his disability.  Rather, it appears simply that

Plaintiff wanted to return to the Special Operator position because of its higher salary and perceived prestige compared to the janitorial position. *See*, Pl.'s Opp'n at 19-20.

Furthermore, during his deposition in connection with instant action, when asked what reasonable accommodation Plaintiff had requested, Plaintiff responded, "[t]o do my full work, the accommodation of hearing aids and using the reasonable accommodation of the earmuff." Hawkins-El Dep., Ex. B to Chiu Decl., at 71. Defendant's counsel attempted to clarify the response and asked Plaintiff, "[s]o you wanted to do your track worker specialist job wearing hearing aids and hearing protection?" *Id*. at 71-72. Plaintiff answered, "[n]o, I wanted to do my operator job that I had been doing for eight years, which those exact things I was doing it with, which were my hearing aids and my ear muffs – my hearing protection." *Id*. at 72. The answers indicate that Plaintiff simply wanted his old job back and the reason is not tied to accommodating his hearing disability, especially considering that he already was permitted to wear his hearing aids and ear protection at work. *Id.*; Micelotta Dep. at 31.

After drawing all reasonable inferences and viewing the record in light most favorable to Plaintiff, the Court finds that Plaintiff fails to make a *prima facie* showing that Defendant refused to provide a reasonable accommodation under the ADA. The Court concludes on this record that no reasonable jury could infer from Plaintiff's emails and testimony that Plaintiff made a request to accommodate his disability by demanding the Special Operator position. Consequently, Plaintiff's reasonable accommodation claim as to the Special Operator position is dismissed with prejudice.

The Court similarly finds that Plaintiff made no reasonable accommodation request with respect to the second practical field test, which took place at Linden Yard on June 14, 2018. *See*, Second PFT Sum. Rept. at 2. There is no evidence that Plaintiff told Defendant that he needed

any modification or accommodation to the test.  Indeed, NYCTA created the second practical field test in order to accommodate Plaintiff in connection with the position he requested to fill. *See*, Bolt Dep. at 99; *See also*, Email by Stephen Perez, dated March 30, 2018, Ex. AA to Chiu Decl., Dkt. Entry No. 18-5, at 3.  As such, Plaintiff fails to make a *prima facie* case here and his claim as to the second practical field test is dismissed with prejudice.

The only remaining reasonable accommodation claim concerns the first practical field test.  Plaintiff's claim is based on a Notice that he sent to Micelotta after the test initially was scheduled for May 5, 2017.  *See*, Notice.  Plaintiff told Micelotta that "I absolutely must refuse any test to be done on my unprotected ears in the underground subway system under normal conditions, with regular train traffic, as the risk of further damage to my ears is too great. . . .  I see no good reason to be tested in a hazardous work environment which does not mirror at all my regular work environment . . . ." *Id.* at 1.

Defendant contends that the Notice did not contain a request for an accommodation because he "did not request that the Practical Field Test take place at Linden Yard instead of the 45th Street Subway Station."  Def.'s Mem. at 12.  When Buckley received the Notice, she interpreted it as a refusal to take the test, and not as an accommodation request.  *See*, Email by Buckley, dated May 2, 2017, Ex. T to Fitzgerald Aff., Dkt. Entry No. 19, at 2.  The Court finds that a reasonable jury could make an inference that, by sending the Notice, Plaintiff requested an outdoor test to accommodate his hearing disability.

Here, the Court must determine what constituted the "essential functions" of the Special Operator position, formally titled "Track Worker (Specialist)."  *See*, Job Detail Summary at 1-3.  Neither party appears to dispute that the ability to hear was an essential function of the job, but the parties differ on whether that essential function was limited to the outdoor work environment

only.  *See*, Def.'s Mem. at 12-13; Pl's Opp'n at 14.

The Second Circuit has noted that "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998) (citing *Doe v. N.Y. Univ*., 666 F.2d 761, 776 (2d Cir. 1981)).  This is because "[e]mployers formulate jobs to fit the needs of their enterprises, and cannot fill jobs without deciding what attributes are essential to those needs."  *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 102-03 (2d Cir. 2003).

Notably, in *Shannon*, the Second Circuit discussed NYCTA's role in determining essential functions of its various positions.  *Id*. at 103.  The Second Circuit held that "[n]o reasonable jury could find that NYCTA exceeded the broad bounds necessarily afforded it under the ADA to decide as an employer whether color vision is an essential qualification for driving a NYCTA bus."  *Id*.  In reaching this decision, the court considered that "NYCTA has a statutory responsibility to operate the transit system for the safety of the public.  Employment decisions may be made in light of that public interest.  And the medical qualifications at issue were designed to service that interest."  *Id.* (internal quotation marks and citations omitted).

The Court finds that the same deference must be given to NYCTA to define essential functions of the Special Operator position.  The purpose of the practical field test was "to determine if [Plaintiff] could function well in the actual job environment while wearing aids." PFT Sum. Rept. at 3.  In addition, Plaintiff failed the test because he "was unable to function well in the actual job environment of a Track Worker."  *Id.* at 4.  This demonstrates that NYCTA determined that the essential functions of the job included the ability to hear certain signals and noises in any work setting, regardless of the location.

Plaintiff argues that he was entitled to have the test held outside "because he had been performing his Specialist Operator job with a reasonable accommodation – that is, working with hearing aids and ear protection in the safe environment at Linden Yard – for more than twenty years." Pl.'s Opp'n at 14. However, a reasonable accommodation never can involve the elimination of an essential function of a job. *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991). By arguing that the practical field test should have been conducted at an outdoor location, Plaintiff sought to eliminate an essential function of the job. Therefore, Plaintiff has failed to establish the third element of the *prima facie* case.

Viewing the evidence in light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that Defendant denied Plaintiff a reasonable accommodation by subjecting him to the first field practical test. Accordingly, Plaintiff's claim as to the first practical field test is dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted and the Complaint is dismissed in its entirety.


SO ORDERED.

Dated:  Brooklyn, New York
            September 16, 2021

                                                  _____
                                                            /s/
                                                  DORA L. IRIZARRY
                                                  United States District Judge

28